11/20/17
4:05 pm

VIRGINIA:        IN THE CIRCUIT COURT FOR THE CITY OF LYNCHBURG

KYLE CARRINGTON,

               Plaintiff,

v.                                                              Civil Action No:

LIBERTY UNIVERSITY,

and                                                             JURY TRIAL DEMAND

LEN STEVENS,
both individually and in his official capacity
as Executive Director of External
Communications at Liberty University,

and

SARAH BROWNING,

               Defendants.



EXHIBIT
tabbies
A

## COMPLAINT

**THIS DAY CAME** the Plaintiff, Kyle Carrington, through his attorney, for his Complaint against Liberty University, et al., and in support thereof respectfully stated the following:

## THE PARTIES

1.   Plaintiff Kyle Carrington (hereafter, "Mr. Carrington") is a natural person, a citizen of the United States, and a resident of the State of New Jersey. Throughout the course of events described herein, Mr. Carrington was a student at Liberty University and a member of the Liberty University football team.  During that time, Mr. Carrington resided at **East 77,** which is a student dormitory owned by Liberty University and operated by its agents.

2.   Defendant Liberty University (hereafter, "DEFENDANT LU, LU, or the University") is a private, Christian, liberal arts university in the City of Lynchburg, Virginia, with an address of 1971 University Boulevard, Lynchburg, Virginia 24515.  DEFENDANT LU is the largest private, nonprofit university in the United States, and the largest university of any kind in the Commonwealth of Virginia.

3.   Upon information and belief, Defendant Len Stevens (hereafter, "DEFENDANT STEVENS") is a resident and domiciliary of the Commonwealth of Virginia who was employed by DEFENDANT LU as the Executive Director of External Communications during the 2016-2017 academic year and is currently employed in the same capacity at the time of this filing.

4.   Upon information and belief, Defendant Sarah Browning (hereafter, "DEFENDANT BROWNING") is a resident and domiciliary of the Commonwealth of Virginia.

## JURISDICTION AND VENUE

5.  This Court has original jurisdiction over the matters in controversy pursuant to §17.1-513 of the Code of Virginia of 1950, as amended.

6.  This Court has personal jurisdiction over DEFENDANT LU on the grounds that it is (and was, at all relevant times) conducting business within the Commonwealth of Virginia.

7.  This Court has personal jurisdiction over DEFENDANTS STEVENS, and BROWNING on the grounds that each is a resident and domiciliary of the Commonwealth of Virginia.

8.  Venue properly lies in the city of Lynchburg, pursuant to §8.01-262 of the Code of Virginia of 1950, as amended.

## NATURE OF THE ACTION

9.  This case arises from DEFENDANT BROWNING's false accusation of sexual assault against Mr. Carrington and other members of the Liberty University football team, DEFENDANT LU's inept and biased handling of the subsequent Title IX process and DEFENDANT LU and DEFENDANT STEVEN's publication and dissemination to the press of false statements regarding Mr. Carrington.

10.  DEFENDANT BROWNING's conduct was malicious, reckless, wanton, willful, egregious, and in total disregard for Mr. Carrington's rights, liberties, reputation, health, and well-being, thereby justifying an award of punitive damages in an amount to be determined at trial.

11.  DEFENDANT LU's conduct was malicious, reckless, wanton, willful, egregious, and in total disregard for Mr. Carrington's rights, liberties, reputation, health, and well-being,

thereby justifying an award of punitive damages in an amount to be determined at trial.

12. DEFENDANT STEVEN's conduct was malicious, reckless, wanton, willful, egregious, and in total disregard for Mr. Carrington's rights, liberties, reputation, health, and well-being, thereby justifying an award of punitive damages in an amount to be determined at trial.

13. Mr. Carrington has been greatly damaged by the defendants' actions: his academic future is severely damaged; his opportunity for a career in athletics is similarly damaged; the funds expended in pursuit of his college education are lost; the innumerable sacrifices made by his family so that he could receive the said opportunities have been squandered; and his reputation and good name have been irreparably damaged.

## FACTUAL ALLEGATIONS

### The Incident

14. Mr. Carrington met DEFENDANT BROWNING during the summer of 2015. They attended one summer class together and were casual, social acquaintances.

15. During the month of August 2015, Mr. Carrington attended a house party hosted by Jordan Elliott at a house on Victoria Avenue in the city of Lynchburg, Virginia.

16. Mr. Carrington arrived at the house around 10:45 p.m. with other LU football players including Cameron Jackson.

17. When Mr. Carrington and Mr. Jackson arrived at the house the party was already in progress. Approximately 70-80 people were present, including several members of the Liberty University football team, dozens of Liberty University students and dozens of non-students. Party-goers were scattered throughout the property, including the house's front

and back yards.

18. Mr. Jackson and Mr. Carrington were initially together inside the house. DEFENDANT BROWNING approached Mr. Jackson and asked him to join her outside. Shortly thereafter, Mr. Carrington went outside to look for Mr. Jackson.

19. Mr. Carrington found Mr. Jackson and DEFENDANT BROWNING at the side of the house. Mr. Carrington joined Mr. Jackson and DEFENDANT BROWNING. The three had a brief conversation at the side of the house.

20. After a few moments of conversation, DEFENDANT BROWNING offered to perform oral sex on both Mr. Jackson and Mr. Carrington.

21. When the three arrived at the side of the house DEFENDANT BROWNING began performing oral sex on the two men.

22. The sex act was quickly interrupted by the sound of other party-goers approaching.

23. Mr. Jackson, DEFENDANT BROWNING, and Mr. Carrington each went separate ways, and returned to the party.

24. As the party continued, DEFENDANT BROWNING approached several other members of the LU football team and offered to perform oral sex.

25. DEFENDANT BROWNING performed oral sex on at least three (3) other members of the LU football team. Two (2) of those acts occurred at the same location at the side of the house where DEFENDANT BROWNING initiated oral sex with Mr. Carrington.

26. During her entire time at the party, DEFENDANT BROWNING was not stumbling, slurring speech, or otherwise showing visible signs of intoxication.

27. Shortly thereafter, officers with the Lynchburg Police Department arrived at the party in response to a citizen complaint regarding the noise of the party.

28.   DEFENDANT BROWNING had the opportunity to speak with the officers. However, DEFENDANT BROWNING did not make any report to the law enforcement officer who were at the scene.

29.   Due to the presence of the police, the party began to break up.

30.   T.J. Tillery, an individual with whom DEFENDANT BROWNING currently had a sexual relationship, offered to give DEFENDANT BROWNING a ride home.

31.   Instead of leaving with Mr. Tillery, DEFENDANT BROWNING approached Mr. Jackson's group and asked where they were going.

32.   Mr. Jackson told DEFENDANT BROWNING that they were going to meet up with other friends at an LU football player's off-campus apartment. DEFENDANT BROWNING said she wanted to join Mr. Jackson's group and joined Mr. Jackson in the Jeep in which he was leaving.

33.   DEFENDANT BROWNING climbed up into the Jeep without assistance; she was not stumbling, slurring speech, or otherwise showing visible signs of intoxication.

34.   Jordan Elliott witnessed the events described in paragraphs 59-61 and later recalled that DEFENDANT BROWNING voluntarily got into the Jeep, without assistance, and without appearing either distressed, concerned, or intoxicated.

35.   Upon information and belief, the interactions described in paragraphs 59-61 all occurred within plain sight and earshot of a Lynchburg police officer who did not note anything unusual or inappropriate about the group's activity.

36.   Mr. Carrington left the party with Zac Parker and Denver Daniels. Mr. Parker drove Mr. Carrington back to his dormitory on the campus of Liberty University. Mr. Carrington arrived back at his room sometime after midnight. Mr. Carrington did not see DEFENDANT

BROWNING again on the evening or morning after the Incident.

37. The morning after the Incident, Tegan Quinton picked up DEFENDANT BROWNING from the off-campus apartment where she had spent the night.

38. When Ms. Quinton asked DEFENDANT BROWNING how her night went, DEFENDANT BROWNING informed Ms. Quinton that she had "hooked up with pretty much every hot guy on the football team."

39. DEFENDANT BROWNING offered Ms. Quinton details of her sexual encounters from memory.

40. In her conversations with Ms. Quinton the morning after the Incident, DEFENDANT BROWNING never suggested that anything non-consensual had occurred.

### Between the Incident and Formal Complaint to the University

41. During the fall semester of 2015, rumors began to circulate on DEFENDANT LU's campus about a girl on the Liberty University swim team who had engaged in sexual acts with multiple football players at an off-campus party in August.

42. The rumors described in Paragraph 70 evolved several times as the story spread through person-to-person communication and social media (i.e., Yik Yak and Twitter).

43. The rumors culminated with a Yik Yak post suggesting that an LU swimmer had been gang-raped by members of the football team.

44. Upon information and belief, DEFENDANT LU initiated an inquiry into the matter after becoming aware of the Yik Yak post referencing a gang-rape.

45. Upon information and belief, DEFENDANT LU was able to ascertain that the Liberty University swimmer referred to in the social media post was DEFENDANT BROWNING.

46.  Upon information and belief, DEFENDANT LU contacted DEFENDANT BROWNING in an effort to confirm the rumors.

47.  DEFENDANT LU's Student Honor Code (i.e., *The Liberty Way*) states that "sexual relations outside of a biblically ordained marriage between a natural-born man and a natural-born woman are not permissible at Liberty University," and encourages students to "avoid the appearance of impropriety." *Exhibit A* at 11.

48.  In accordance with *The Liberty Way*, persons found to have engaged in "sexual misconduct" (which includes appearing in "any state of undress with a member of the opposite sex") are punished with 18 demerit points, a $250 dollar fine, and 18 hours of community service; persons who accumulate 30 demerits face the possibility of administrative withdrawal. *Exhibit A* at 11 and 13.

49.  Upon information and belief, DEFENDANT BROWNING contacted a friend, JANE DOE, to seek advice prior to meeting with DEFENDANT LU's Student Conduct staff.

50.  Upon information and belief, when DEFENDANT BROWNING was seeking advice about dealing with Student Conduct personnel, DEFENDANT BROWNING asked, "Do you think I should say I was raped?"

51.  Upon information and belief, at that time DEFENDANT informed officials at DEFENDANT LU via email that no non-consensual sex occurred on the night of the Incident.

52.  Upon information and belief, DEFENDANT LU also became aware that DEFENDANT BROWNING was abusing illegal drugs during the Fall 2015 semester.

53.  Illegal drug use is a violation of *The Liberty Way*.

54.  Upon information and belief, DEFENDANT LU met with DEFENDANT BROWNING

during the Fall 2015 semester to advise her of the possible consequences of illegal drug use and to recommend possible treatment options.

55.   Upon information and belief, DEFENDANT BROWNING continued to abuse illegal drugs following that meeting.

56.   During the spring of 2016, DEFENDANT BROWNING and Mr. Carrington began a non-exclusive sexual relationship.  Upon information and belief, DEFENDANT BROWNING, was simultaneously involved in non-exclusive sexual relationships with several other Liberty University students, including Cameron Jackson.  These relationships were public knowledge on the Liberty University campus.

57.   Upon information and belief, DEFENDANT LU met with DEFENDANT BROWNING during the Spring 2016 semester to advise her again of the possible consequences of illegal drug use and to recommend treatment options.

58.   Upon information and belief, DEFENDANT BROWNING continued to abuse illegal drugs following that meeting.

59.   Upon information and belief, DEFENDANT LU removed DEFENDANT BROWNING from the University through the process of administrative withdrawal during the Spring 2016 semester for violations of *The Liberty Way*.

60.   Upon information and belief, after her administrative withdrawal, DEFENDANT BROWNING moved home to Mechanicsville, Virginia, but continued to communicate with a number of DEFENDANT LU's students, including, among others, her friends JANE DOE and JANE ROE.

61.   Upon information and belief, following her departure from the University, DEFENDANT BROWING sent a video message through the social media platform Snapchat which

included an anti-LU rant punctuated by DEFENDANT BROWNING's declaration: "Fuck LU! I can take down that whole football team."

62.    Upon information and belief, the message described in Paragraph 61 is consistent with statements DEFENDANT BROWNING made to other LU students.

## False Allegations

63.    On July 13, 2016, approximately eleven (11) months after the Incident, DEFENDANT BROWNING contacted DEFENDANT LU's Office of Community Life to make a report regarding events on the night of the Incident. In this report, DEFENDANT BROWNING claimed that the Incident was not consensual.

64.    Upon information and belief, DEFENDANT BROWNING's account of the Incident changed multiple times. DEFENDANT BROWNING first claimed to have been raped by as many as eight (8) members of the football team at the party on Victoria Avenue. Later, that number dropped to six (6) football players. In another version of the story, DEFENDANT BROWNING claimed she was raped by only three (3) football players and that the rapes occurred after the party at the off-campus apartment.

65.    In what became the final version of the story, DEFENDANT BROWNING claimed that she was sexually assaulted by three (3) men. Those men were Kyle Carrington, Cameron Jackson and Avery James.

66.    DEFENDANT BROWNING claimed that the oral sex involving Mr. Carrington and Mr. Jackson was accomplished by force and against her will.

67.    DEFENDANT BROWNING also claimed that alcohol and/or another unknown chemical substance prevented her ability to consent to such activity.

68. Upon information and belief, DEFENDANT BROWNING did not report the Incident to the Lynchburg Police Department, the Lynchburg Commonwealth's Attorney's Office, the Virginia State Police, or any other law enforcement agency until after such agencies contacted her about the University's investigation.

69. Upon information and belief, the Lynchburg Police Department was contacted about the Incident by the University. As a result, Mr. Carrington was subject to an active police investigation simultaneous to the University's investigation.

70. As rumors of DEFENDANT BROWNING's allegations spread through campus, T.J. Tillery confronted DEFENDANT BROWNING about inconsistencies in her story.

71. According to Mr. Tillery, DEFENDANT BROWNING responded to his questions by acknowledging: "Yeah, I kept hooking up with [Mr. Jackson] afterwards, but I got in trouble for this, that, and the other. And, it's time for the football players to pay for something for once."

72. Upon information and belief, Mr. Tillery and DEFENDANT BROWNING were also engaged in a non-exclusive, sexual relationship when the confrontation described in Paragraphs 70-71 occurred.

73. Upon information and belief, DEFENDANT BROWNING used her relationship with Mr. Tillery to pressure Mr. Tillery into offering false statements to DEFENDANT LU's Title IX investigators on her behalf.

74. Upon information and belief, in speaking with his teammates later, Mr. Tillery admitted that his only knowledge of any non-consensual activity on the night of the Incident came from DEFENDANT BROWNING's own accounts of the Incident months after it had allegedly occurred.

75. Upon information and belief, when Mr. Tillery's teammates asked him why DEFENDANT BROWNING was making the allegations, Mr. Tillery explained that DEFENDANT BROWNING was upset at being removed from school over her substance abuse issues and that, "Basically, she's doing this because we [football players] don't get in trouble for anything."

**Inquiry, Investigation, and Conduct Review Committee**

76. The University's procedures for reporting and investigating potential violations of the Education Amendments of 1972, 20 U.S.C. to §1681 *et seq.,* are outlined in both *The Liberty Way* and the *Liberty Sexual Harassment, Discrimination, and Assault Policy* (hereafter, "DEFENDANT LU's policies"). True copies of DEFENDANT LU's policies (as they existed prior to February 20, 2017) are attached as *Exhibit A* and *Exhibit B,* respectively.

77. Upon receiving a report of a potential violation of the *Liberty Sexual Harassment, Discrimination, and Assault Policy*, DEFENDANT LU's Director of Title IX and/or a member of the Title IX Office was required to conduct a "Title IX Initial Inquiry" to determine whether the alleged facts rose to the level of conduct prohibited under DEFENDANT LU's policies. *Exhibit B* at 8-9.

78. Once DEFENDANT LU's Director of Title IX with the assistance of the Title IX office had completed the Initial Inquiry and determines that a violation may have occurred, DEFENDANT LU was required to commence a "Formal Investigation." *Exhibit B* at 8-9.

79. The Assistant Director of Title IX for Liberty University during all relevant times was Valerie Dufort.

80.   Throughout the investigatory process, the University "strongly encourages" potential witnesses to offer testimony corroborating allegations of sexual misconduct; the University offers "cooperating witnesses" immunity from punishment for their own Student Honor Code violations and allows those "cooperating witnesses" to remain at the University without being sanctioned for their improper acts. *Exhibit B* at 7-8.

81.   Upon information and belief, student witnesses relied upon by DEFENDANT LU's investigators to support a finding of sexual assault in Mr. Carrington's case had violated the *Liberty Way* and could have been subject to sanctions if not for DEFENDANT LU's policy regarding "cooperating" witnesses.

82.   Upon information and belief, DEFENDANT LU's Title IX investigators narrowed their investigation to Mr. Jackson, Mr. Carrington, and Mr. James by eliminating the "suspects" who spoke with investigators as "cooperating witnesses," and proceeding only with the three (3) men who chose to maintain their constitutional right to remain silent while an active criminal investigation was in progress.

83.   The formal investigation process concluded with a hearing before the Conduct Review Committee on September 8, 2016.

84.   In accordance with DEFENDANT LU's policies, the Conduct Review Committee decided the outcome of the Formal Investigation by relying on the information and recommendations provided the University's Title IX investigators. *Exhibit B* at 10.

85.   Upon information and belief, Title IX investigators provided the Conduct Review Committee with written witness statements that summarized the Incident. The Committee did not hear live testimony. Therefore, neither the testimony nor the people who provided that testimony were subject to the scrutiny of questions or cross-examination.

86. Upon information and belief, the only evidence presented to the Conduct Review Committee that tended to corroborate allegations of non-consensual sex were the accuser's own statements and the statements provided by individuals whose only basis for knowledge of the sex act was the information provided to them by the accuser months after the Incident.

87. The Conduct Review Committee determined that Mr. Carrington was responsible for violating the *Liberty Sexual Harassment, Discrimination, and Assault Policy.*

88. Individuals who were found responsible for violating the *Liberty Sexual Harassment, Discrimination, and Assault Policy* faced the following consequences: (1) up to 30 demerit points, (2) community service, (3) fines ranging up to $500.00 USD, (4) administrative withdrawal from the University for a minimum of two semesters, and (5) a transcript notation indicating the reason that the student was removed from the University. *Exhibit B* at 16.

89. Mr. Carrington was given the harshest available punishment (i.e., administrative withdrawal/transcript notation).

90. Mr. Carrington was not provided an opportunity to review any records related to the investigation or to confront the witnesses or evidence being used against him prior to Conduct Review Committee hearing.

91. Following the Conduct Review Committee, Mr. Carrington questioned the due process concerns described in Paragraph 90. Agents of DEFENDANT LU responded that Mr. Carrington was not provided access to any of the evidence because he had not asked for it.

92. DEFENDANT LIBERTY's Title IX policies at that time did not include any requirements

to notify the accused of the right to review evidence. *Exhibit B.*

93. Prior to the Conduct Review Committee hearing, agents of DEFENDANT LU strongly implied that Mr. Carrington's presence at the Conduct Review Committee hearing was not important unless he intended to make additional statements.

94. As a result of the statements from the agents of DEFENDANT LU, Mr. Carrington was not present at the Conduct Review Committee hearing.

### Between the Conduct Review Committee Hearing and the Appeal

95. DEFENDANT LU notified Mr. Carrington on September 9, 2016 that the Conduct Review Committee had found him responsible for violating the *Liberty Sexual Harassment, Discrimination, and Assault Policy* and had issued the punishment of administrative withdrawal/transcript notation.

96. Mr. Carrington immediately notified DEFENDANT LU that he was appealing the decision.

97. DEFENDANT LU's policies specifically prohibit retaliatory action taken by "an accused individual" or "by a third party or group of people" against a person who files a complaint or assists with an investigation, but DEFENDANT LU's policies do not specifically offer equal protections for the person accused of violating the policy. *Exhibit B* at 7, 12-13.

98. This policy disproportionately impacts male students in a foreseeable way. Male students are far more likely to be the persons accused of non-consensual sex and, accordingly, are not afforded the same protections available to females.

99. In accordance with DEFENDANT LU's policies, DEFENDANT LU is, itself, specifically prohibited from retaliating against anyone who files a complaint or assists with the

investigation, but DEFENDANT LU's policies do not specifically prohibit DEFENDANT

LU from retaliating against persons accused of violating the policy. *Exhibit B* at 7.

100.  This policy disproportionately impacts male students in a foreseeable way. Male students

are far more likely to be accused of non-consensual sex and, accordingly, are not afforded

the same protections available to females.

101.  DEFENDANT LU's policies define the term "retaliation" to include actions that are

"intimidating, threatening, coercing, discouraging or in any way discriminating against an

individual." The policies also state that an "action is generally deemed retaliatory if it

would deter a reasonable person in the same circumstances from…participating in the

processes described in this policy." *Exhibit B* at 12-13.

102.  On September 12, 2016, with Mr. Carrington's appeal already pending, DEFENDANT

LU issued a press release under the headline, "Statement of Findings on Sexual Assault

Allegations." A true copy of the said press release is attached as *Exhibit C.*

103.  The press release announced that Mr. Carrington had been found responsible for violating

DEFENDANT LU's policy on sexual assault.

104.  Upon information and belief, the press release referenced in Paragraph 102-103 was

written and distributed to media outlets by DEFENDANT STEVENS.

105.  Prior to distribution of the press release, no media outlet had published, broadcast, or

otherwise publicly disseminated any information related to the Incident or the subsequent

investigation.

106.  Every local television station, the local newspaper and several local radio stations ran the

story. Television and print media included in their stories a picture of Mr. Carrington

without his consent.

107.  The immediate effect of the press release was to harass, intimidate, discourage, and humiliate Mr. Carrington in a manner that would deter any reasonable person from participating in the ongoing Title IX process.

108.  Following the distribution of the press release, Mr. Carrington was ostracized by the student body.  The humiliation became so severe that Mr. Carrington returned to his parents' home and stopped attending his classes even while his appeal was pending.

109.  Therefore, DEFENDANT LU's press release meets its own definition of "prohibited action" (i.e., "action is generally deemed retaliatory if it would deter a reasonable person in the same circumstances from...participating in the processes described in this policy.").

110.  As DEFENDANT LU's investigation continued to gain publicity, multiple new witnesses emerged to offer information that cast doubt on the veracity of DEFENDANT BROWNING's allegations.

111.  Agents of DEFENDANT LU attempted to discourage these witnesses from participating in the process.

112.  Specifically, Valerie Dufort, who was at the time the Assistant Director of Title IX at Liberty University, told Bri McCaffery, "It's not going to help you to be associated with this...If you see your name attached to this, and – people don't have any idea about it. They're going to question your credibility and your connection and your actions. Only because, that's the way human nature is. You really don't want to be involved in this.  It's ugly in every which way."

113.  Dufort also told McCaffery, "It doesn't help because – now, if you really have something important to say, your credibility has already been hurt by the fact that you didn't come forward earlier. And now that the whole information has come out as far as the

adjudication, people want to speak up. But, it's a little late for that and it's not going to help anybody's case to come forward now and say, 'Oh, well, I was there' or 'Oh, I know these people.'"

114. Throughout her conversations with potential witnesses, DEFENDANT DUFORT exhibited bias by repeatedly referring to Mr. Carrington, Cameron Jackson, and Avery James as "the offenders."

115. Upon information and belief, other witnesses claim to have met similar resistance when attempting to offer evidence to DEFENDANT LU's staff in the Office of Community Life.

116. Dufort's characterization of the accused men as "offenders" is indicative of a gender bias, wherein men accused of sexual assault are presumed guilty.

117. Dufort's efforts to discourage witnesses are indicative of a gender bias, wherein female complainants are presumed to be honest and contrary evidence is actively suppressed.

118. Upon information and belief, Valerie Dufort's biases impacted her ability to fairly investigate the Incident.

119. Upon information and belief, Valerie Dufort's biases affected the way she framed evidence and recommendations that were presented to the Conduct Review Committee.

120. Institutional biases that favor accusers over the accused are, inherently, gender biases due to the fact that male students are far more likely to be the persons accused of non-consensual sex and, accordingly, it is foreseeable that a bias against the accused will discriminate against men.

## The Appeal

121. As the date for Mr. Carrington's appeal approached, the Office of the Commonwealth's Attorney for the City of Lynchburg notified Mr. Carrington that its investigation would be

complete and a charging decision would be made within a matter of days.

122. Mr. Carrington asked DEFENDANT LU to delay his appeal for a short time in order to allow the criminal investigation to be completed.

123. Mr. Carrington also asked DEFENDANT LU to delay the appeal hearing due to difficulties in getting discovery from DEFENDANT LU in a timely fashion.

124. DEFENDANT LU denied that request.

125. Mr. Carrington's appeal was held on October 3, 2016. Mr. Carrington appeared at that hearing with the assistance of counsel.

126. Just moments before Mr. Carrington's hearing, agents of DEFENDANT LU notified Mr. Carrington that new witnesses with new evidence had testified on behalf of his teammate, Mr. Jackson, at the hearing that had just concluded. Agents of DEFENDANT LU asked Mr. Carrington if he wanted the new testimony to be considered at his hearing. However, DEFENDANT LU refused to inform Mr. Carrington of the nature of the new evidence. DEFENDANT LU also did not provide time for Mr. Carrington or his attorney to speak to the new witnesses.

127. Due to this lack of information, Mr. Carrington elected not to have this new evidence considered in his appeal hearing.

128. Upon information and belief, this new evidence included firsthand accounts of DEFENDANT BROWNING's role in the Incident. Those accounts offered a detailed description of DEFENDANT BROWNING's statements and actions in the hours and minutes leading up to the sex acts, descriptions of some of the sex acts that occurred at the Incident (including her statements and actions of consent on the night of the Incident), and accounts of DEFENDANT BROWNING's statements and actions in the minutes, hours,

days, weeks, and months following the Incident. This testimony would have bolstered Mr. Carrington's case.

129. According to policy, the appeal panel was to be comprised of three (3) faculty members and two (2) students. *Exhibit A* at 17. The panel that heard Mr. Carrington's appeal did not include any students.

130. Regardless of the panel's composition, the press release and publicity therefrom tainted any possibility of an impartial panel.

131. In accordance with DEFENDANT LU's policies, Mr. Carrington offered two grounds for his appeal: (1) the Conduct Review Committee's Formal Investigation/Hearing was procedurally flawed, and (2) new evidence was available for review.

132. On appeal, Mr. Carrington proposed that the Conduct Review Committee's Formal Investigation was procedurally flawed in that Mr. Carrington was denied due process. Specifically, Mr. Carrington was not given access to the information that would be presented to the Conduct Review Committee. Without access to that information prior to the hearing, Mr. Carrington was denied the opportunity to fully understand the allegations against him or to properly address the evidence against him.

133. DEFENDANT LU's policies require the findings of a Title IX investigation to be based on a preponderance of evidence standard.

134. To support its finding of sexual assault, the Conduct Review Committee cited the twelve (12) "facts" it claims amounted to a preponderance of evidence. Four (4) of those "facts" are wholly irrelevant to the issue of consent. Five (5) of those "facts" are plainly false.

135. One of the "facts" cited by the Conduct Review Committee was that "there is no known motive or incentive for [the accuser] to report the allegations, due to the fact that she is no

longer a student and is not in the area."

136. This "fact" is demonstrably false.

137. The fact that DEFENDANT BROWNING was administratively removed from the University would, by any reasonable standard, be viewed as a motive to fabricate allegations that could damage the University.

138. Additionally, the "fact" cited in Paragraph 135 ignores new evidence presented to the Appeal Board from witnesses who indicated that DEFENDANT BROWNING had communicated a specific desire to harm the University generally and football players specifically.

139. Another of the twelve (12) "facts" cited by the Conduct Review Committee was that DEFENDANT BROWNING's therapist had provided an opinion that DEFENDANT BROWNING's behavior (i.e., hyper-sexual behavior and drug abuse) was indicative of someone who had experienced sexual trauma and consistent with a person attempting to self-medicate in response to the said trauma.

140. In order for the "fact" cited in Paragraph 139 to support the Conduct Review Committee's ultimate finding, one would have to ignore the statements provided by DEFENDANT BROWNING's former swim coach and former RA.   Both statements noted that DEFENDANT BROWNING's behavioral issues began long before the Incident during DEFENDANT BROWNING's freshman year.

141. Another of the twelve (12) "facts" cited by the Conduct Review Committee was that Coach Shellenberger, Kaylyn Gyuris, Chelsea Pond, and Rachel Hoeve remarked on the notable changes they observed in the accuser following the Incident.

142. The "fact" cited in Paragraph 141 is demonstrably false. Coach Shellenberger's written

statement specifically noted that DEFENDANT BROWNING's troubling behavior began during the second half of DEFENDANT BROWNING's freshman year. Upon information and belief, all of the statements that described DEFENDANT BROWNING's behavior depicted DEFENDANT BROWNING as a person on a downward spiral that either predated the Incident or began at an undetermined time.

143.   Another of the twelve (12) "facts" cited by the Conduct Review Committee was that it was confirmed through T.J. Tillery's statements that Mr. Carrington had been drinking alcohol at the time of the Incident.

144.   That "confirmation" is false. Mr. Tillery's statement does not include any such statement regarding Mr. Carrington's consumption of alcohol. Even if the allegation of consuming alcohol had been confirmed, that "fact" would have been wholly irrelevant to the question of consent.

145.   One of the twelve (12) "facts" cited by the Conduct Review Committee was that, during the course of the argument between two individuals outside Jordan Elliott's party on Victoria Avenue, Zac Parker allegedly said to Tillery, "Why are you always trying to save hoes?" The Conduct Review Committee says this statement was an indication that "something of a sexual nature occurred" at the party.

146.   The issue of whether Zac Parker and DEFENDANT BROWNING engaged in "something of a sexual nature" that led to an argument between Tillery and Parker is completely irrelevant to the question of whether or not Mr. Carrington sexually assaulted DEFENDANT BROWNING.

147.   Another of the twelve (12) "facts" cited by the Conduct Review Committee was that Mr. Carrington had a reputation for promiscuous behavior.

148.  That "fact" amounts to nothing more than an assault on Mr. Carrington's character and is wholly irrelevant to the issue of consent.

149.  Another of the twelve (12) "facts" cited by the Conduct Review Committee was that Mr. Carrington violated a verbal directive prohibiting him from speaking about the investigation.

150.  Mr. Carrington explained at the appeal hearing that he had been instructed during the process to consider "campus resources."   Mr. Carrington considered Mrs. Beitz, his academic advisor, to be one of those "campus resources."

151.  Even if Mr. Carrington had violated the verbal directive of those working to implicate him, that "fact" is wholly irrelevant to the issue of consent.

152.  Another "fact" cited by the Conduct Review Committee was that DEFENDANT BROWNING had been forthcoming about her sexual relationships with members of the football team.

153.  It is impossible for the Committee to reach that conclusion with any degree of certainty unless someone on the Committee had actual knowledge of the details of the sexual activity of DEFENDANT BROWNING and all of the members of the football team.

154.  Even if the Conduct Review Committee was correct in its conclusion that DEFENDANT BROWNING was forthcoming about her sexual exploits, that "fact" is wholly irrelevant to the issue of consent.

155.  Under DEFENDANT LU's policies, "consent" is defined as:

> "informed, mutually understandable words or actions (freely and actively given), which indicate a willingness to participate in mutually agreed upon act or purpose [sic]. It is voluntary and active, not passive. Effective consent may never be given by: minors, mentally disabled persons, and persons who are incapacitated as a result of alcohol or other drugs or those who are unconscious, incapacitated or otherwise physically helpless. Use of alcohol or other drugs will never function to excuse

behavior that violates this policy. Silence, by itself, cannot constitute consent. Consent to one sexual act does constitute or imply consent to repeated future acts or other acts. Consent is always required, regardless of the parties' relationship or history together. *Exhibit B* at 12.

156. Upon information and belief, DEFENDANT BROWNING's statements assert a claim that she had consumed alcohol on the night of the Incident, but there is no evidence to support a finding that she was either incapacitated or unconscious, as required by DEFENDANT LU's policies for a finding of sexual assault. To the contrary, multiple witnesses indicated that DEFENDANT BROWNING was not showing signs of intoxication.

157. DEFENDANT BROWNING's words and actions in the hours and days following the sex act do not support a finding that she was either incapacitated or unconscious.

158. DEFENDANT BROWNING's words and actions in the hours, days, weeks, and months following the Incident do not support a finding of non-consensual sex.

159. The evidence makes clear that DEFENDANT BROWNING did not believe at the time that she was the victim of a sexual assault, nor did she act in conformity therewith.

160. In addition, new exculpatory evidence was discovered after the Conduct Review Committee's ruling. To wit, DEFENDANT BROWNING had provided DEFENDANT LU with a written statement a mere month after the Incident in response to DEFENDANT LU's inquiry about the Yik Yak post. That statement, which unequivocally denied that anything inappropriate had occurred, was not available to the Conduct Review Committee prior to its ruling. That statement was available at the time of the appeal.

161. Given the evidence, the inconsistencies, and the accuser's motive for bias, no reasonable fact finder could support a finding of sexual assault in the absence of institutional bias, insufficient guidelines, discrimination, negligence, and/or incompetence.

162. The policies of DEFENDANT LU discriminate against males. Those policies, as

implemented by agents of DEFENDANT LU during the Title IX process did in fact discriminate against Mr. Carrington based on his male gender.

### DEFENDANT LU's Improper Motives

163.  Upon information and belief, DEFENDANT LU's decision to issue the press release and DEFENDANT LU's discriminatory handling of the Title IX process was influenced, in part, by its strong desire to foster a public image that the University is tough on Title IX allegations and is sensitive to the needs of women.

164.  In the fall of 2016, DEFENDANT LU had a particular need to enhance its image on these issues due to its recruitment of Athletic Director Ian McCaw and President Jerry Falwell, Jr.'s public endorsement of presidential candidate Donald J. Trump.

165.  Upon information and belief, DEFENDANT LU had been actively recruiting former Baylor University Athletic Director Ian McCaw for a position within the University since shortly after his resignation from Baylor on May 30, 2016.

166.  Upon information and belief, DEFENDANT LU's interest in McCaw predated McCaw's resignation by several months and included internal discussions between LU President Jerry Falwell, Jr. and other senior staff members about the need to "act quickly" if McCaw became available.

167.  McCaw's resignation from Baylor University came amid significant criticism of his response to a highly publicized sexual assault scandal involving members of the Baylor football team.

168.  Upon information and belief, DEFENDANT LU anticipated that any decision to hire McCaw would come with heavy criticism.

169. During its pursuit of McCaw, DEFENDANT LU retained a Boston law firm to vet McCaw for a position within the University.

170. Upon information and belief, DEFENDANT LU had expended (or made plans to expend) a significant amount of time, money, and resources in pursuit of McCaw prior to the University's decision to issue its September 12, 2016 press release about the Incident.

171. Upon information and belief, prior to September 12, 2016, DEFENDANT LU's senior administrators believed or had reason to believe that the University's ability to retain McCaw could be jeopardized if the University appeared to be weak on Title IX allegations.

172. Upon information and belief, prior to September 12, 2016, DEFENDANT LU's senior administrators believed or had reason to believe that any public criticism of their decision to hire McCaw would be worse if the Liberty University developed a public image that was weak on Title IX.

173. Upon information and belief, the University's September 12, 2016 press release was hastily issued with reckless disregard for the truth in order to frame a potentially embarrassing story in a way that would cast the University in a positive light.

174. In a conversation with Liberty University student Bri McCaffery, Valerie Dufort confirmed that DEFENDANT LU had issued a press release about the Incident and its investigation because people were starting to talk on social media and "this isn't what we want for the college. I mean, we're Champions for Christ, you know? Not, 'Oh, wow. Look at all that's going on here!'…When all this social media came out, we realized we had to do something about it, okay? We couldn't let the media get a hold of this and just do what they want because I'm a former police officer and I've seen how the media trashes a report."

175. LU President Jerry Falwell, Jr. was one of Donald J. Trump's earliest and staunchest supporters in his bid for election as President of the United States. Mr. Falwell used his position as president of DEFENDANT LU as a platform to endorse Mr. Trump.

176. A significant criticism of Donald Trump, both during the primaries and the general election, focused on Mr. Trump's demeaning, misogynistic and, at times, predatory comments and actions towards women.

177. Upon information and belief, as a result of this issue and LU President Falwell's public allegiance to Mr. Trump, DEFENDANT LU was facing enhanced public scrutiny for its treatment of women.

178. Upon information and belief, the enhanced scrutiny resulting from LU President Falwell's alliance with Donald Trump influenced DEFENDANT LU's handling of the allegations against Mr. Carrington.

179. Upon information and belief, DEFENDANT LU's desire to appear sensitive to the needs of women in the face of allegations surrounding Donald Trump impacted, in part, DEFENDANT LU's decision to issue the press release and deny Mr. Carrington due process.

**Mr. Carrington's Entire Future is Severely Damaged by LU's Actions**

180. As a result of DEFENDANT LU's actions, Mr. Carrington's entire academic career is severely damaged and, without a college education, his overall economic future is compromised.

181. At the start of the Fall 2016 semester, Mr. Carrington had four (4) years of football eligibility remaining. However, Mr. Carrington had already completed seventy-seven (77)

of the one hundred twenty (120) credits required for his degree in criminal justice. Mr. Carrington was on track to complete his master's degree while on scholarship at Liberty University.

182. Currently, Mr. Carrington's education is at a standstill as a result of DEFENDANT LU's decision to expel him and publicly declare him responsible for sexual assault.

183. Mr. Carrington's academic and disciplinary record is irrevocably and irreversibly tarnished and will not withstand scrutiny by any another educational institution upon his application for transfer.

184. As a result of DEFENDANT LU's actions, the financial resources expended by Mr. Carrington's parents in pursuit of Mr. Carrington's academic and athletic endeavors have been squandered.

185. Mr. Carrington's athletic career, which showed great promise, is now compromised, on hold, and possibly destroyed.

186. Any attempt to move on with his future in the face of DEFENDANT LU's arbitrary and capricious decision will be met with great resistance and little success; it is a known fact that the likelihood of Mr. Carrington being accepted to a school with the academic and athletic caliber merited by his record has been significantly compromised. Any attempt to achieve a graduate degree is similarly compromised.

187. Without appropriate redress, the unfair outcome of DEFENDANT LU's policies will continue to cause irreversible damage to Mr. Carrington.

188. Mr. Carrington seeks redress from this Court to undo the wrongs occasioned by DEFENDANT LU on his education and future.

## COUNT I
## DEFENDANT LIBERTY UNIVERSITY

### Violation of Title IX of the Education Amendments of 1972

189. Mr. Carrington repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

190. Title IX of the Education Amendments of 1972, 20 U.S.C. to § 1681 *et seq.*, provides, in relevant part, that:

> "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

191. Title IX of the Education Amendments of 1972 applies to an entire school or institution if any part of that school receives federal funds; hence, athletic programs are subject to Title IX of the Education Amendments of 1972, even though there is very little direct federal funding of school sports.

192. Upon information and belief, DEFENDANT LU receives federal funding, including but not necessarily limited to the hundreds of million dollars awarded to its students each year as federal aid.

193. Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for prompt and equitable resolution of student…complaints alleging any action which would be prohibited by" Title IX or the regulations thereunder. 34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of Justice). Such prohibited actions include all forms of sexual harassment, including sexual intercourse, sexual assault, and rape. *See, generally,* U.S. Dep't of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or*

*Third Parties – Title IX* (2001) at 19-20, 21 & nn.98-101.

194. The procedures adopted by a school covered by Title IX must not only "ensure the Title IX rights of the complainant," but must also *accord due process to both parties involved…" Id.* at 22 (emphasis added).

195. The "prompt and equitable" procedures that a school must implement in order to accord due process to both parties must include, at a minimum:

   a. "Notice…of the procedure, including where complaints may be filed";

   b. "Application of the procedure to complaints alleging (sexual) harassment…";

   c. "Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence";

   d. "Designated and reasonably prompt timeframes for the major stages of the complaint process"; and

   e. "Notice to the parties of the outcome of the complaint…" *Id.* at 20.

196. A school also has an obligation under Title IX to make sure that all employees involved in the conduct of the procedures have "adequate training as to what conduct constitutes sexual harassment," which includes "alleged sexual assaults." *Id.* at 21.

197. The University's procedures for reporting and investigating potential violations of the Education Amendments of 1972, 20 U.S.C. to §1681 *et seq.*, are outlined in both *The Liberty Way* and the *Liberty Sexual Harassment, Discrimination, and Assault Policy* (hereafter, "DEFENDANT LU's policies"). True copies of DEFENDANT LU's policies (as they existed prior to February 20, 2017) are attached as *Exhibit A* and *Exhibit B,* respectively.

198. DEFENDANT LU's policies created a motive for students to fabricate allegations of

sexual misconduct. By banning sexual relations outside of a Biblically ordained marriage, cautioning students to avoid any appearance of impropriety, urging students to report their classmates' violations of the Student Honor Code, and enforcing strict discipline for such violations, the DEFENDANT LU made it foreseeable that persons accused of engaging in any sexual activity will claim that such activity was not consensual.

199. Upon information and belief, DEFENDANT LU's policies disproportionately impact male students in a foreseeable way. Male students, when faced with allegations of sexual activity, are far less likely to report that they were victims of non-consensual sex than their female counterparts.

200. Upon information and belief, DEFENDANT LU's policies created an institutional bias against male students. The policies created an atmosphere where women accused of engaging in sexual activity who later claimed the activity was unwanted will benefit from a presumption of truth, while accused male students who claimed the activity was consensual are not afforded the same presumption.

201. DEFENDANT LU's policies fail to adequately address the possibility that allegations of sexual misconduct will be fabricated. Students who made false reports of sexual misconduct faced only the possibility that they "may" be subjected to disciplinary action. *Exhibit B* at 3, 10 and 16.

202. Upon information and belief, the University had no established policy for addressing false reports by non-students.

203. Upon information and belief, these policies (or lack thereof) disproportionately impact male students in a foreseeable way because males are far more likely to be accused of initiating non- consensual sex than their female counterparts.

204. DEFENDANT LU's strict punishment for sexual activity (consensual or otherwise), coupled with the University's lack of policy for dealing with false reports by non-students creates an atmosphere where malicious false reporting by aggrieved or jilted non-students is both possible and foreseeable.

205. Based on the foregoing, DEFENDANT LU has deprived Mr. Carrington, on the basis of his gender, of his rights to due process and equal protection through the improper administration of and/or existence, in its current state, of DEFENDANT LU's policies.

206. Based on the foregoing, DEFENDANT LU has deprived Mr. Carrington, on the basis of his gender, of his right to prompt and equitable resolution of complaints alleging actions prohibited by Title IX (specifically, retaliation).

207. Based on the foregoing, DEFENDANT LU conducted its investigation of the Incident and subsequent hearings in a manner that was biased against the male being accused. From the outset, the actions of the agents of DEFENDANT LU were highly improper in that they demonstrated an inherent bias and predetermination of Mr. Carrington's guilt, based on his status as the male accused.

208. Furthermore, both the Conduct Review Committee's formal hearing and the Appeal Board's appeal were slanted in favor of DEFENDANT BROWNING and took her statements at face value despite contradictory witness statements and despite DEFENDANT BROWNING's own contradictory statement delivered to the University in the weeks immediately following the Incident. The Committee's decision (and subsequent Appeal Board decision) had no rational basis in fact and can only be explained by the University's discriminatory policies and predetermination of guilt.

209. The decision by the Conduct Review Committee (and subsequent decision by the Appeal

Board) reflects a failure to consider the evidence and/or witness statements in support of Mr. Carrington's defense, and demonstrates DEFENDANT LU's favorable treatment of DEFENDANT BROWNING on the basis of her gender.

210. DEFENDANT LU created an environment where an accused male student is fundamentally denied due process by being prosecuted throughout the Title IX process under a presumption of guilt. This one-sided process deprived Mr. Carrington, as a male student, of educational and athletic opportunities at LU on the basis of his gender.

211. In this case, Mr. Carrington was punished for having consensual sexual intercourse with a woman who initiated and consented to the sexual activity. By finding Mr. Carrington responsible for a sexual assault under these circumstances, DEFENDANT LU demonstrated that it had no intention of following its own policies and procedures for Mr. Carrington, the male accused.

212. DEFENDANT LU further demonstrated that it had no intention of following its own policies and procedures for Mr. Carrington, the male accused of sexual assault, when it ignored new evidence and issued a press release that foreseeably discouraged Mr. Carrington from participating in the process.

213. In Mr. Carrington's case, DEFENDANT LU imposed the highest of five (5) possible sanctions for a charge of sexual assault, namely, administrative withdrawal, without any apparent consideration of his mitigating factors.

214. Based on the foregoing facts, DEFENDANT LU's decision to uphold a finding of sexual assault and render the harshest available sanction was unfairly influenced by the University's desire to preserve its own public image as a leading Christian university, regardless any fairness or due process it owed to Mr. Carrington.

215.  Based on the foregoing facts, DEFENDANT LU's decision to uphold a finding of sexual assault and render the harshest available sanction was unfairly influenced by the University's desire to recruit Ian McCaw and its fear that negative publicity over a Title IX investigation could jeopardize that process.

216.  Based on the foregoing facts, DEFENDANT LU's decision to uphold a finding of sexual assault and render the harshest available sanction was unfairly influenced by the University's desire to appear supportive of women in the face of criticism stemming from Mr. Falwell's public alliance with Donald Trump.

217.  Based on the foregoing facts, DEFENDANT LU's decision to issue a press release that announced Mr. Carrington's culpability prior to the appeal unfairly prejudiced the investigatory process and influenced the Appeal Board's decision to uphold the Conduct Review Committee's finding—to the detriment of Mr. Carrington's educational experience and athletic career.

218.  Based on the foregoing facts, DEFENDANT LU's decision to issue a press release that announced Mr. Carrington's culpability prematurely and unfairly was influenced, in part, by DEFENDANT LU's desire for positive press regarding its handling of sexual assaults during its recruitment of Ian McCaw.

219.  Based on the foregoing facts, DEFENDANT LU's decision to issue a press release that announced Mr. Carrington's culpability prematurely and unfairly was influenced, in part, by DEFENDANT LU's desire for positive press regarding its handling of sexual assaults at a time when the University was facing scrutiny stemming from Mr. Falwell's public alliance with Donald Trump.

220.  Based on the foregoing facts, DEFENDANT LU's policies were written in a way that

disproportionately affects the male student population of the LU community in a foreseeable manner, without appropriate policies to promote equal protection.

221. Based on the foregoing, male respondents in sexual misconduct cases at the University are discriminated against on the basis of their gender.

222. Based on the foregoing facts, DEFENDANT LU's actions, taken as a whole, amounted a gender bias against Mr. Carrington.

223. As a result of the foregoing facts, Mr. Carrington is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## COUNT II
## DEFENDANT LIBERTY UNIVERSITY

### Defamation by Implication

224. Mr. Carrington repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

225. On September 12, 2016, DEFENDANT STEVENS, working as an agent of DEFENDANT LU, authored, published, and distributed a press release under the headline, "Statement of Findings on Sexual Assault Allegations."

226. The said press release is attached hereto as *Exhibit C* and incorporated, herein, by reference.

227. In relevant part, the press release stated that:

> "On July 13, 2016, Liberty University received a report of sexual assault...Liberty University has a process in place for handling reports of sexual harassment, discrimination and assault...Liberty University has followed that process in this case...As a result of the investigation and hearing held on September 8, 2016, two current students, Cameron

Jackson and Kyle Carrington, and one former student, Avery James, were found responsible for violating the Student Honor Code and Liberty University's Policy on Sexual Harassment, Discrimination, and Assault. As part of the process, each of these students has a right to appeal the Conduct Review Committee's decision."

228. The press release withheld significant relevant facts, including but not limited to the following: (1) Mr. Carrington had asserted, and continued to assert, a claim of innocence, (2) Mr. Carrington had already demanded an appeal, (3) Mr. Carrington did not attend the September 8, 2016 hearing to defend himself in part because of the statements and actions of agents of DEFENDANT LU, (4) The University did not provide Mr. Carrington with the evidence being used against him, (5) Mr. Carrington had not had an opportunity to confront the witnesses against him, (6) The University had not followed its own policies, and (7) The University's policies discriminate against men accused of sexual assault.

229. The University omitted the facts referenced in Paragraph 228 in a calculated effort to convince readers that the matter was fairly and thoroughly investigated and that the t Review Committee's findings were accurate – to the prejudice of Mr. Carrington.

230. The acts and omissions that resulted in the creation and distribution of the press release prioritized the University's public image over accuracy and fairness.  The press release was published wantonly, willfully, maliciously and with reckless disregard for the truth.

231. The University's decision to prioritize its own public image over accuracy and fairness to Mr. Carrington is indicative of malice.

232. The context and circumstances surrounding the publication of the press release reasonably caused the statement to convey a defamatory meaning to its recipients.

233. The statements referenced in Paragraph 227, taken together and in the context of the press release as a whole, created the inference, implication, and/or insinuation that Mr.

Carrington did, in fact, commit the sexual assault that was reported to the University on July 13, 2016.

234.  The implication that Mr. Carrington committed a sexual assault is false.

235.  A statement falsely implying that person has committed a sexual assault is defamatory.

236.  The statements referenced in Paragraph 227, taken together and in the context of the press release as a whole, created the inference, implication, and/or insinuation that Mr. Carrington had been found responsible for a sexual assault despite his ongoing attempts to defend himself. This bolstered the overall implication that Mr. Carrington had, in fact, committed the sexual assault.

237.  The implication that Mr. Carrington was found responsible for sexual assault despite his ongoing attempts to defend himself is false. This false implication bolstered the overall implication that Mr. Carrington had, in fact, committed the sexual assault.

238.  The statements referenced in Paragraph 227 indicate that the University followed the process outlined in the *Liberty Sexual Harassment, Discrimination, and Assault Policy.*

239.  Based on the foregoing facts, the implication that the University followed its policy in this case is false.  This false implication bolstered the overall implication that Mr. Carrington had, in fact, committed the sexual assault.

240.  The press release, while noting that Mr. Carrington had the right to appeal, withheld the significant fact that Mr. Carrington had already reasserted a claim of innocence and demanded an appeal. This omission highlights the University's intent to imply guilt while suppressing any information tending to suggest innocence.

241.  Based on the foregoing facts, the University's press release was published with reckless disregard for the truth and with malicious intent.

242.  DEFENDANT LU distributed the press release cited in Paragraph 227 to multiple local news organizations.

243.  DEFENDANT LU intended the news organizations to believe the statements and implications contained in the press release, and to use the press release to develop and publish news stories for mass consumption by the public.

244.  Multiple news organizations (including, among others, The Lynchburg News & Advance, The Roanoke Times, WSET, WDBJ, WSLS, WLNI, WIQO, and the Associated Press) received, read, and believed the statements and implications contained in the press release.

245.  Multiple news organizations used the press release to develop and publish news stories for mass consumption by the public.

246.  Multiple news stories repeated the statements and implications contained in the press release.

247.  As a result of the news reports, countless members of the public received or became aware of the statements and implications contained in the press release and believed them to be true.

248.  Prior to the distribution of the press release, no news organization had published any information about the Incident or Mr. Carrington's alleged involvement.

249.  Multiple news organizations included in their stories a picture that helped to further identify and humiliate Mr. Carrington.

250.  DEFENDANT LU owned all rights to the picture described in Paragraph 249.

251.  DEFENDANT LU knew that multiple news outlets were using its picture of Mr. Carrington.

252.  DEFENDANT LU made no effort to prevent, disrupt, or discourage the use of its picture.

253. DEFENDANT LU's decision to allow media outlets to continue using its property to identify and humiliate Mr. Carrington was malicious and cruel.

254. As a direct and proximate result of the above conduct, Mr. Carrington sustained tremendous damages, including, without limitation, emotional distress, loss of educational and athletic opportunities, economic injuries, reputational damages, and other direct and consequential damages.

255. As a result of the foregoing facts, Mr. Carrington is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

256. DEFENDANT LU's conduct was malicious, reckless, wanton, willful, egregious, and in total disregard for Mr. Carrington's rights, liberties, reputation, health, and well-being, thereby justifying an award of punitive damages in an amount to be determined at trial.

## COUNT III
## DEFENDANT LIBERTY UNIVERSITY

### Defamation, *Per Se*

257. Mr. Carrington repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

258. Based on the aforementioned facts and circumstances, DEFENDANT LU maliciously published defamatory statements about Mr. Carrington. Those statements were received by and believed by multiple members of the media and public.

259. Based on the aforementioned facts and circumstances, DEFENDANT LU's defamatory statements falsely implied that Mr. Carrington had committed a sexual assault.

260. DEFENDANT LU's statements falsely implying that Mr. Carrington had committed a

crime of moral turpitude (i.e., sexual assault) were so egregious and so inherently harmful as to constitute defamation *per se.*

261.  As a direct and proximate result of the above conduct, Mr. Carrington sustained tremendous damages, including, without limitation, emotional distress, loss of educational and athletic opportunities, economic injuries, damage to reputation and other direct and consequential damages.

262.  As a result of the foregoing facts, Mr. Carrington is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

263.  DEFENDANT LU's conduct was malicious, reckless, wanton, willful, egregious, and in total disregard for Mr. Carrington's rights, liberties, reputation, health, and well-being, thereby justifying an award of punitive damages in an amount to be determined at trial.

## COUNT IV
## DEFENDANT LIBERTY UNIVERSITY

### Declaratory Judgment

264.  Mr. Carrington repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

265.  DEFENDANT LU has committed numerous violations of the federal and state law.

266.  Mr. Carrington's education and future careers have been severely damaged. Without appropriate redress, the unfair outcome of the investigatory process will continue to cause irreversible damages to Mr. Carrington's educational career and future employment prospects, with no end in sight.

267.  As a result of the foregoing, there exists a justiciable controversy between the Parties with

respect to the outcome, permanency, and future handling of Mr. Carrington's formal student record at the University.

268.    By reason of the foregoing, Mr. Carrington requests, pursuant to 28 U.S.C. § 2201, a declaration that: (i) the outcome and findings made by DEFENDANT LU's Conduct Review Committee be reversed; (ii) Mr. Carrington's reputation be restored; (iii) Mr. Carrington's disciplinary record be expunged; (iv) the record of Mr. Carrington's administrative withdrawal from the University be removed from his education file; (v) any record of Mr. Carrington's Formal Hearing and/or Appeal be permanently destroyed; and (vi) DEFENDANT LU's rules, regulations, and guidelines are unconstitutional as applied.

## COUNT V
## DEFENDANT LEN STEVENS
### (individually, and in his official capacity)

#### Defamation by Implication

269.    Mr. Carrington repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

270.    On September 12, 2016, DEFENDANT STEVENS authored, published, and distributed a press release under the headline, "Statement of Findings on Sexual Assault Allegations."

271.    The said press release is attached hereto as *Exhibit C* and incorporated, herein, by reference.

272.    The press release withheld significant relevant facts, including but not limited to the following: (1) Mr. Carrington had asserted, and continued to assert, a claim of innocence, (2) Mr. Carrington had already demanded an appeal, (3) Mr. Carrington did not attend the September 8, 2016 hearing to defend himself in part because of the statements and actions

of agents of DEFENDANT LU, (4) The University did not provide Mr. Carrington with the evidence being used against him, (5) Mr. Carrington had not had an opportunity to confront the witnesses against him, (6) The University had not followed its own policies, and (7) The University's policies discriminate against men accused of sexual assault.

273. DEFENDANT STEVENS omitted the facts referenced in Paragraph 268 in a calculated effort to convince readers that the matter was fairly and thoroughly investigated and that the Review Committee's findings were accurate – to the prejudice of Mr. Carrington.

274. The acts and omissions that resulted in the creation and distribution of the press release prioritized the University's public image over accuracy and fairness. The press release was published wantonly, willfully, maliciously and with reckless disregard for the truth.

275. DEFENDANT STEVENS' decision to prioritize the University's public image over accuracy and fairness to Mr. Carrington is indicative of malice.

276. The context and circumstances surrounding the publication of the press release reasonably caused the statement to convey a defamatory meaning to its recipients.

277. The statements referenced in Paragraph 227, taken together and in the context of the press release as a whole, created the inference, implication, and/or insinuation that Mr. Carrington did, in fact, commit the sexual assault that was reported to the University on July 13, 2016.

278. The implication that Mr. Carrington committed a sexual assault is false.

279. A statement falsely implying that person has committed a sexual assault is defamatory.

280. The statements referenced in Paragraph 227, taken together and in the context of the press release as a whole, created the inference, implication, and/or insinuation that Mr. Carrington had been found responsible for a sexual assault despite his ongoing attempts

to defend himself. This bolstered the overall implication that Mr. Carrington had, in fact, committed the sexual assault.

281. The implication that Mr. Carrington was found responsible for sexual assault despite his ongoing attempts to defend himself is false. This false implication bolstered the overall implication that Mr. Carrington had, in fact, committed the sexual assault.

282. The statements referenced in Paragraph 227 indicate that the University followed the process outlined in the *Liberty Sexual Harassment, Discrimination, and Assault Policy.*

283. Based on the foregoing facts, the implication that the University followed its policy in this case is false. This false implication bolstered the overall implication that Mr. Carrington had, in fact, committed the sexual assault.

284. The press release, while noting that Mr. Carrington had the right to appeal, withheld the significant fact that Mr. Carrington had already reasserted a claim of innocence and demanded an appeal. This omission highlights the University's intent to imply guilt while suppressing any information tending to suggest innocence.

285. Based on the foregoing facts, the University's press release which was drafted and disseminated by DEFENDANT STEVENS was published with reckless disregard for the truth and with malicious intent.

286. DEFENDANT STEVENS distributed the press release cited in Paragraph 227 to multiple local news organizations.

287. DEFENDANT STEVENS intended the news organizations to believe the statements and implications contained in the press release, and to use the press release to develop and publish news stories for mass consumption by the public.

288. Multiple news organizations (including, among others, The Lynchburg News & Advance,

The Roanoke Times, WSET, WDBJ, WSLS, WLNI, WIQO, and the Associated Press) received, read, and believed the statements and implications contained in the press release.

289. Multiple news organizations used the press release to develop and publish news stories for mass consumption by the public.

290. Multiple news stories repeated the statements and implications contained in the press release.

291. As a result of the news reports, countless members of the public received or became aware of the statements and implications contained in the press release and believed them to be true.

292. Prior to the distribution of the press release, no news organization had published any information about the Incident or Mr. Carrington's alleged involvement.

293. As a direct and proximate result of the above conduct, Mr. Carrington sustained tremendous damages, including, without limitation, emotional distress, loss of educational and athletic opportunities, economic injuries, reputational damages, and other direct and consequential damages.

294. As a result of the foregoing facts, Mr. Carrington is entitled to damages in an amount to be determined at trial, plus pre-judgment interest, attorneys' fees, expenses, costs, and disbursements.

295. DEFENDANT STEVENS' conduct was malicious, reckless, wanton, willful, egregious, and in total disregard for Mr. Carrington's rights, liberties, reputation, health, and well-being, thereby justifying an award of punitive damages in an amount to be determined at trial.

## COUNT VI
## DEFENDANT LEN STEVENS
### (individually, and in his official capacity)

### Defamation, *Per Se*

296. Mr. Carrington repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

297. Based on the aforementioned facts and circumstances, DEFENDANT STEVENS published defamatory statements about Mr. Carrington, which said statements were received by and believed by multiple members of the media and public.

298. Based on the aforementioned facts and circumstances, DEFENDANT STEVENS's defamatory statements falsely implied that Mr. Carrington had committed a sexual assault.

299. DEFENDANT STEVENS's statements falsely implying that Mr. Carrington had committed a crime of moral turpitude (i.e., sexual assault) were so egregious and so inherently harmful as to constitute defamation *per se*.

300. As a direct and proximate result of the above conduct, Mr. Carrington sustained tremendous damages, including, without limitation, emotional distress, loss of educational and athletic opportunities, economic injuries, damage to reputation and other direct and consequential damages.

301. As a result of the foregoing facts, Mr. Carrington is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

302. DEFENDANT STEVENS' conduct was malicious, reckless, wanton, willful, egregious, and in total disregard for Mr. Carrington's rights, liberties, reputation, health, and well-being, thereby justifying an award of punitive damages in an amount to be determined at

trial.

## COUNT VII
### DEFENDANT SARAH BROWNING

#### Defamation

303.  Mr. Carrington repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

304.  On July 13, 2016, DEFENDANT BROWNING reported to agents of Liberty University both verbally and in writing, that she had been sexually assaulted by multiple members of the Liberty University football team.

305.  DEFENDANT BROWNING's July 13, 2016 report listed Mr. Carrington among her attackers.

306.  Mr. Carrington never sexually assaulted DEFENDANT BROWNING.

307.  DEFENDANT BROWNING's July 13, 2016 statements were false.

308.  At the time that she made the statements about Mr. Carrington, DEFENDANT BROWNING knew that the statements were not true.

309.  A statement falsely implying that person has committed a sexual assault is defamatory.

310.  DEFENDANT BROWNING's false statements about Mr. Carrington conveyed a defamatory meaning to their recipients.

311.  The persons who received DEFENDANT BROWNING's defamatory statements believed the statements to be true.

312.  As a direct and proximate result of the above conduct, Mr. Carrington sustained tremendous damages, including, without limitation, emotional distress, loss of educational and athletic opportunities, economic injuries, reputational damages, and other direct and

consequential damages.

313. As a result of the foregoing facts, Mr. Carrington is entitled to damages, in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

314. DEFENDANT BROWNING's conduct was malicious, reckless, wanton, willful, egregious, and in total disregard for Mr. Carrington's rights, liberties, reputation, health, and well-being, thereby justifying an award of punitive damages in an amount to be determined at trial.

## COUNT VIII
## DEFENDANT SARAH BROWNING

### Defamation, *Per Se*

315. Mr. Carrington repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

316. Based on the aforementioned facts and circumstances, DEFENDANT BROWNING published defamatory statements about Mr. Carrington, which said statements were received by and believed by multiple members of public.

317. Based on the aforementioned facts and circumstances, DEFENDANT BROWNING's defamatory statements falsely implied that Mr. Carrington had committed a sexual assault.

318. DEFENDANT BROWNING's statements falsely implying that Mr. Carrington had committed a crime of moral turpitude (i.e., sexual assault) were so egregious and so inherently harmful as to constitute defamation *per se*.

319. As a direct and proximate result of the above conduct, Mr. Carrington sustained tremendous damages, including, without limitation, emotional distress, loss of educational

and athletic opportunities, economic injuries, damage to reputation and other direct and consequential damages.

320. As a result of the foregoing facts, Mr. Carrington is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

321. DEFENDANT BROWNING's conduct was malicious, reckless, wanton, willful, egregious, and in total disregard for Mr. Carrington's rights, liberties, reputation, health, and well-being, thereby justifying an award of punitive damages in an amount to be determined at trial.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, for the foregoing reasons, Mr. Carrington requests that the Court award the following relief and enter a judgement against DEFENDANT LU as follows:

a. On Counts I, II and III, an award in the amount of FIFTY MILLION DOLLARS ($50,000,000), in actual and presumed damages as compensation for the general damage done to his mental, emotional and physical well-being, plus punitive damages, prejudgment interest, attorney's fees, expenses and court costs.

WHEREFORE, for the foregoing reasons, Mr. Carrington requests that the Court award the following relief and enter a judgement against DEFENDANT STEVENS as follows:

a. On Counts IV AND V, an award in the amount of TWO HUNDREND FIFTY THOUSAND DOLLARS ($250,000), in actual and presumed damages as

compensation for the general damage done to his mental, emotional and physical well-being, plus punitive damages, prejudgment interest, attorney's fees, expenses and court costs.

WHEREFORE, for the foregoing reasons, Mr. Carrington requests that the Court award the following relief and enter a judgement against DEFENDANT BROWNING as follows:

a.   On Counts VI AND VII, an award in the amount of FIFTY MILLION DOLLARS ($50,000,000), in actual and presumed damages as compensation for the general damage done to his mental, emotional and physical well-being, plus punitive damages, prejudgment interest, attorney's fees, expenses and court costs.

## JURY DEMAND

Mr. Carrington herein demands a trial by jury of all triable issues in the present matter.

DATED:      Lynchburg, Virginia
            September 11, 2017

Respectfully submitted,

**KYLE CARRINGTON**


by:      Rebecca L. Wetzel, Esq., VSB 68775
         *Counsel for the Plaintiff*


Rebecca L. Wetzel, VSB 68775
Wetzel and Washburn, PLLC
17835 Forest Road, Suite B
Forest, VA 24551
Phone: 434.485.6513
Fax: 434.658.1301
Email: rwetzel@wetzelandwashburn.com